IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 18-CR-02032 |
| Plaintiff, | ) | **INFORMATION** |
| vs. | ) | Count 1 |
| | ) | 18 U.S.C. § 1832(a)(1) |
| | ) | Theft of Trade Secrets |
| JOSH HARRY ISLER, | ) | |
| | ) | Count 2 |
| Defendant. | ) | 18 U.S.C. § 1001(a)(1): |
| | ) | False Material Statements |
| | ) | to the FBI |

The United States Attorney charges:

## Count 1

## Theft of Trade Secrets

### Background

At all times material to this Information:

a. DuPont

1.  E.I. DuPont de Nemours and Company ("DuPont"), headquartered in Wilmington, Delaware, was an international science company that employs approximately 44,000 people worldwide and was annually ranked as one of the 75 largest companies in the United States. The company's manufacturing, processing, marketing, research and development facilities, as well as regional purchasing offices and distribution centers were located throughout Europe, Asia, Africa, North and South America. Within the United States, DuPont had facilities in Delaware,

1

Wisconsin, South Carolina, and California, to name a few, as well as Cedar Rapids, Iowa.

2. Some of DuPont's employees were employed as sales consultants providing face-to-face contact with different customers worldwide and throughout the United States. It was typical for some DuPont Sales consultants to work from their home while being issued a DuPont laptop, cell phone, and vehicle as part of their home/field based employment package.

3. In 2011, DuPont acquired Danish company Danisco. This acquisition allowed DuPont to gain production of food and feed additives and enzymes used in biofuels. Danisco's Industrial Bioscience division (previously known as Genencor) has a principal place of business in Palo Alto, California, and focuses on industrial biotechnology products such as enzymes for laundry and dishwashing detergents; enzymes for bioethanol and carbohydrate processing as well as textile treatment; and enzymes for bread, animal feed, and brewing applications.

4. The enzymes produced to aid in the fuel ethanol production process allow ethanol producers to convert the starch found in corn into fermentable sugars that yeast uses to produce ethanol. There are about 200 fuel ethanol plants in the United States, with the majority of those plants located near the corn in the Midwest states of Iowa, Minnesota, Wisconsin, Illinois, and Nebraska. DuPont was one of a few major producers of enzymes for ethanol production.

5. The enzymes and the ethanol fuel produced therefrom were produced for sale and placement in interstate and foreign commerce.

6. As part of its normal business operations, DuPont created, developed, used, and maintained certain confidential and proprietary information that was valuable to DuPont and was related to the research, creation, development, testing, marketing, and pricing of its products, including ethanol fuel enzymes.

7. DuPont maintained its proprietary information as confidential, and took reasonable measures to protect and keep that information, including trade secrets, secret. These protective measures included, but were not limited to: physical security of the exterior and interior of DuPont facilities; implementing data security policies and computer firewalls to prevent unauthorized access; maintaining computer systems that can generate reports of abnormal computer activity; monitoring computer activity on DuPont's computer network; limiting access to certain of its information to DuPont employees with work-related reasons to require access to that information; blocking certain transfers of information outside DuPont's computer network; and classifying and labeling as confidential and proprietary certain documents and other DuPont information.

8. DuPont derived independent economic value, both actual and potential, from its confidential and proprietary information not being generally known to, and not being readily ascertainable through proper means by, the public and its competitors.

9. In addition to the above-referenced security measures, DuPont created and required its employees to sign confidentiality agreements as a condition of employment. These confidentiality agreements included an obligation to safeguard DuPont's non-public information and a prohibition against unauthorized use,

3

copying, and disclosure of DuPont's confidential information without DuPont's express authorization.

10. DuPont also created and trained employees on a Code of Conduct that required employees to be aware that DuPont's trade secrets could not be disclosed to others except pursuant to a written confidentiality agreement; that employees were not permitted to make or take copies of DuPont's information when departing employment with the company; that the prohibition on disclosure of DuPont's non-public information continued even after an employee left the company; and that there were potential civil and criminal penalties for violations of these requirements.

11. Further, DuPont conducted exit interviews of departing employees in an effort to ensure departing employees were reminded of and complied with their obligations under the confidentiality agreement and Code of Conduct.

b. Defendant

12. Defendant Josh Harry Isler was employed as the Lab Manager at an ethanol fuel plant in Iowa between 2007 and early 2013. That ethanol plant was then a fuel enzymes customer of DuPont.

13. On December 5, 2012, defendant applied for employment as a Technical Service Engineer with Genencor-Danisco (a division of DuPont).

14. On January 22, 2013, defendant was offered employment as a Technical Service Account Manager related to DuPont's ethanol fuel enzyme business. Defendant signed the offer letter on February 1, 2013, and accepted employment with DuPont's Danisco U.S. division.

4

15. On February 1, 2013, defendant signed an employee confidentiality and inventions assignment agreement. As part of that agreement, defendant agreed:

> [a]t all times during my employment and thereafter, I will hold in confidence and will not disclose, use, lecture upon, or publish any of the Company's Confidential Information [as defined in the agreement], except as such use is required in connection with my work for the Company, or unless the Chief Executive Officer (the "CEO") or Chief Technology Officer ("CTO") of the company expressly authorizes in writing such disclosure or publication.

16. As part of that same agreement, defendant agreed that upon termination of his employment or upon the company's request at any other time:

> I will deliver to the Company all of the Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company and certify in writing I have fully complied with the foregoing obligation. I agree I will not copy, delete, or alter any information contained upon my Company computer before I return it to Company.

17. On April 23, 2013, defendant completed training on DuPont's "Records and Information Management" and on DuPont's Code of Conduct ("the Code"). The Code required that all DuPont employees conduct themselves and their business affairs "with the highest ethical standards." Further, the Code made clear that employees needed to be aware of trade secrets and take steps to protect them by complying with DuPont's trade secrets policy. The Code specified that trade secrets may only be disclosed to others under a written agreement that applied to the disclosure and had been approved by the legal department. The Code provided that employees who leave the company must:

5

- Promptly return all company assets, including physical materials and DuPont information assets, such as computers, mobile phones, calling cards, access cards, keys, business cards, and electronic storage media.
- Not make or take copies of DuPont information when departing.
- Not disclose DuPont non-public information to others even after leaving the company.

Failure to comply with this obligation may result in severe civil and criminal penalties.

18. The Code also imposed a requirement that all employees protect the Company's intellectual property, trademarks, and assets, and not steal, or misappropriate the trade secrets or information of a competitor. The Code noted "[t]here are heavy legal penalties for employees who misappropriate other's trade secrets."

19. Defendant was aware from his training and experience in the ethanol fuel business that the trade secrets and proprietary information of one company were not to be shared with a competitor as doing so could harm the owner of the information. Defendant knew DuPont's pricing information was proprietary and a trade secret not to be shared with competitors. If the information was disclosed to a competitor, the competitor would have an advantage as to where they needed to price their products to compete with DuPont. Similarly, defendant knew that certain testing, yield, and other information concerning DuPont's ethanol fuel enzymes (especially those in development) was sensitive trade secret information that was not to be removed or shared contrary to DuPont's policies.

20. Beginning by at least last July 2013, defendant began having discussions with corporate officials of a smaller competitor of DuPont in the ethanol

fuel enzyme business ("the competitor") concerning their desire to hire defendant to work for them.

21. On August 8, 2013, defendant was offered and accepted a position with the competitor as a "Technical Representative" with a start date of August 26, 2013. Defendant also signed a "Non-Disclosure Agreement" with the competitor, dated August 8, 2013, that accompanied the job offer and prohibited defendant from disclosing any reports, data, notes, or other documents of the competitor "without limitation."

22. On August 9, 2013, defendant submitted his DuPont resignation via email and noted therein that he was giving two weeks' notice and his last day with DuPont would be August 23, 2013.

23. Between August 9, 2013 and August 23, 2013, defendant communicated with officials of the competitor via email and text message. In some of these communications, defendant transferred proprietary and trade secret information of DuPont.

24. Between at least August 11 and August 19, 2013, defendant transferred hundreds of DuPont's electronic files to an external media device folder. Defendant knew the files he downloaded contained proprietary information and trade secrets of DuPont and many related to customers of DuPont who were also customers of the competitor or whose business was being sought by the competitor. Defendant retained this information after he terminated his employment with DuPont.

25. On August 23, 2013, defendant participated in an exit interview by phone with a DuPont Human Resources (HR) employee. The HR employee emphasized the need for confidentiality of DuPont's intellectual property (IP). Defendant acknowledged receiving and understanding a copy of his confidentiality agreement and that he understood the need to keep DuPont's IP private after he left the company. The HR employee told defendant that he could be held personally liable if he were to violate any part of the agreement and offered to serve as a resource to defendant in the even he was unsure what could disclose. Defendant stated he understood what the HR employee was saying and took it seriously. Defendant's employment with DuPont ended at 5:00 p.m. on August 23, 2013.

26. Defendant thereafter began employment with the competitor and remained so employed.

27. At no time did defendant receive authorization from DuPont to take, transfer, download, or retain proprietary and trade secret information of DuPont.

### The Offense

28. During at least August 2013, in the Northern District of Iowa and elsewhere, the defendant, JOSH HARRY ISLER, with the intent to convert trade secrets related to products that are produced for and placed in interstate and foreign commerce, to the economic benefit of one or more persons other than the owner of the trade secrets, and intending and knowing that the offense would injure the owner of such trade secrets, knowingly did steal, take, misappropriate, and carry away, without authorization, trade secrets of DuPont.

This was in violation of Title 18, United States Code, Section 1832(a)(1).

## Count 2

### False Material Statements to the FBI

29. On or about November 8, 2013, in the Northern District of Iowa, defendant JOSH HARRY ISLER did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the executive branch of the Government of the United States, in that defendant falsely denied when interviewed by agents of the FBI that he had downloaded, to his DuPont or personal electronic storage devices, files containing proprietary information of DuPont. The statements and representations were false because, as defendant then and there knew, between at least August 11 and August 19, 2013, and thereafter, defendant downloaded hundreds of files containing proprietary information of DuPont to one or more of his personal electronic storage devices.

30. This was in violation of Title 18, United States Code, Section 1001(a)(2).

PETER E. DEEGAN, JR.
United States Attorney

By: *[signature]*

RICHARD L. MURPHY
Assistant United States Attorney